Nicholas Jabbar Williams v. State of Maryland, No. 37, September Term, 2021

**ALLEGED LEGAL OR FACTUAL INCONSISTENCIES IN VERDICTS – NO-IMPEACHMENT RULE – MARYLAND RULE 5-606(b) – SUFFICIENCY OF THE EVIDENCE –** Court of Appeals held that guilty verdict as to second-degree murder was not legally inconsistent with not-guilty verdicts as to first-degree assault and use of firearm in commission of crime of violence (second-degree murder) because neither offense of which defendant was acquitted is lesser-included offense of second-degree murder. In determining whether verdicts were legally inconsistent, Court considered jury instructions given by trial court and elements of offenses. Court declined to overrule McNeal v. State, 426 Md. 455, 461-62, 44 A.3d 982, 986 (2012), in which it concluded that factually inconsistent verdicts are permissible in criminal jury trials.

In addition, Court of Appeals held that trial court did not err in granting motion to strike information obtained from jurors after verdict concerning jury's deliberations, including affidavit from one juror, and did not abuse its discretion in denying motion for new trial. Court concluded that jurors' statements were barred from receipt by trial court under no-impeachment rule and Maryland Rule 5-606(b), which provide that trial court may not inquire into validity of jury's verdict based on information about jury's deliberations obtained from jurors after verdict has been taken.

Court of Appeals also held that evidence was sufficient to support convictions for second-degree murder and possession of regulated firearm while under age of twenty-one.

Circuit Court for Charles County
Case No. C-08-CR-18-000005
Argued: February 7, 2022

IN THE COURT OF APPEALS

OF MARYLAND

No. 37

September Term, 2021

_____

NICHOLAS JABBAR WILLIAMS

v.

STATE OF MARYLAND

_____

Getty, C.J.
*McDonald
Watts
Hotten
Booth
Biran
Wilner, Alan M. (Senior Judge,
Specially Assigned),

JJ.

_____

Opinion by Watts, J.
McDonald and Booth, JJ., concur.

_____

Filed: March 25, 2022

*McDonald, J., now a Senior Judge, participated in the hearing and conference of this case while an active member of this Court. After being recalled pursuant to Md. Const., Art. IV, § 3A, he also participated in the decision and adoption of this opinion.

Pursuant to Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Maryland case law establishes that verdicts can be inconsistent in two ways—legally and factually. In a criminal case, verdicts are legally inconsistent where a defendant is convicted of an offense but acquitted of another offense that has the same elements as the offense of which the defendant was convicted. See McNeal v. State, 426 Md. 455, 458, 44 A.3d 982, 984 (2012). In other words, verdicts are legally inconsistent "where a defendant is acquitted of a 'lesser included' crime embraced within a conviction for a greater offense." Id. at 458 n.1, 44 A.3d at 984 n.1. Legally inconsistent verdicts are impermissible in criminal trials. See id. at 458, 470, 44 A.3d at 984, 991. In a criminal jury trial, where a trial court has properly instructed a jury as to the offenses at issue and the jury nonetheless reaches legally inconsistent verdicts, the jury has, presumptively, failed to follow the jury instructions given by the court. See id. at 458, 44 A.3d at 984.

In a criminal case, verdicts are factually inconsistent where proof of the charged offenses involves establishing the same facts and the offenses have different legal elements, and a trier of fact acquits the defendant of one offense but convicts of the other. See id. at 458, 44 A.3d at 984. For instance, a guilty verdict as to possession of a regulated firearm by a disqualified person might be factually inconsistent with a not-guilty verdict as to wearing, carrying, or transporting a handgun, if there were a single set of facts in which the defendant possessed or carried a handgun after being convicted of a disqualifying crime. See id. at 472-73, 44 A.3d at 992-93. Factually inconsistent verdicts are impermissible in criminal bench trials, but they are permitted in criminal jury trials. See id. at 462, 470, 44 A.3d at 986, 991. This is because, in a criminal jury trial, factually inconsistent verdicts "may be the product of lenity, mistake, or a compromise to reach

unanimity, and [] continual correction of such matters would undermine the historic role of the jury as the arbiter of questions put to it." Id. at 470, 44 A.3d at 991 (cleaned up).

In this case, we must determine whether a jury's guilty verdict as to second-degree murder is legally inconsistent with not-guilty verdicts as to first-degree assault and use of a firearm in the commission of a crime of violence. We must also determine whether the trial court abused its discretion in denying a motion for a new trial based on the jury having allegedly returned inconsistent verdicts. Finally, we must determine whether the evidence is sufficient to support convictions for second-degree murder and possession of a regulated firearm while under the age of twenty-one.

In the Circuit Court for Charles County, the State, Respondent, charged Nicholas Jabbar Williams, Petitioner, with first-degree premeditated murder of Cameron Marcel Townsend, use of a firearm in the commission of a crime of violence (murder), first-degree assault of Townsend, use of a firearm in the commission of a crime of violence (first-degree assault), possession of a regulated firearm while under the age of twenty-one, and wearing, carrying, or transporting a handgun in a vehicle. The jury found Williams guilty of second-degree murder and possession of a regulated firearm while under the age of twenty-one and not guilty of first-degree assault and use of firearm in the commission of a crime of violence (second-degree murder).[1] Williams's counsel objected on the ground that the guilty verdict as to second-degree murder was legally inconsistent with the not-guilty verdict as to first-degree assault. Williams's counsel requested that the circuit court have

---

[1]The jury found Williams not guilty of first-degree murder and guilty of wearing, carrying, or transporting a firearm in a vehicle.

the jury "redeliberate" with respect to second-degree murder. The circuit court denied the request and accepted the jury's verdicts.

Williams filed a motion for a new trial, contending that statements made by jurors after the jury had been dismissed indicated that the jury misinterpreted the jury instructions on second-degree murder and other matters. Williams attached to the motion an affidavit signed by one of the jurors in this case, containing allegations concerning the jury's deliberations. The State moved to strike the statements in the motion for a new trial that were attributed to jurors. The circuit court granted the motion to strike, sealed the affidavit,[2] and denied the motion for a new trial.

Williams appealed, and, without affirming or reversing, the Court of Special Appeals ordered a limited remand to the circuit court with instruction to determine whether a firearms examiner's report was admissible under Rochkind v. Stevenson, 471 Md. 1, 236 A.3d 630 (2020). See Williams v. State, 251 Md. App. 523, 574, 546, 254 A.3d 556, 586, 570 (2021). Although the Court of Special Appeals did not affirm the convictions, the Court rejected Williams's contentions as to the issues before us. See id. at 538, 572, 567, 254 A.3d at 565, 585, 582. Williams filed a petition for a writ of *certiorari*, which we granted. See Williams v. State, 476 Md. 262, 261 A.3d 239 (2021).

Before us, Williams contends that the guilty verdict as to second-degree murder and the not-guilty verdicts as to first-degree assault and use of firearm in the commission of a crime of violence (second-degree murder) are inconsistent because in finding him not

---

[2]Williams filed, and we granted, an unopposed motion to correct the record on appeal by adding the affidavit to the record under seal.

guilty of first-degree assault and use of firearm in the commission of second-degree murder, the jury necessarily determined that he did not shoot Townsend. Williams asserts that in returning a verdict of guilty as to second-degree murder and a verdict of not guilty as to first-degree assault and use of firearm in the commission of a crime of violence, the jury failed to follow the circuit court's jury instructions on second-degree murder, the presumption of innocence, the burden of proof, and the requirement to decide this case based only on the evidence. Williams argues that it is permissible for the Court to consider information that he obtained from jurors after the verdict, including the affidavit accompanying the motion for a new trial, because the information demonstrates that the State failed to prove him guilty of second-degree murder. Finally, Williams asserts that the evidence is insufficient to support the convictions for second-degree murder and possession of a regulated firearm while under the age of twenty-one.

Below, in Part I, we hold that the verdicts are not legally inconsistent because the instructions given to the jury were correct and neither of the offenses at issue of which Williams was acquitted—first-degree assault and use of a firearm in the commission of a crime of violence—is a lesser-included offense of second-degree murder. In Part II, we hold that the circuit court did not abuse its discretion in denying the motion for a new trial in light of the "no-impeachment rule"—*i.e.*, the longstanding principle that impeachment of a jury verdict with information about the jury's deliberations obtained from jurors after

the verdict had been returned is not permitted.  In Part III, we hold that the evidence was

sufficient to support the challenged convictions.[3]

## BACKGROUND

### Evidence and Bill of Particulars

The Court of Special Appeals summarized the evidence as follows:

> Detective [John] Long testified that Williams owned and drove a black Hyundai Accent, pictures of which the State moved into evidence. [Justin] Skinner testified that on December 14, 2017, Williams drove Townsend, [Devin] Hall, and Skinner to a shoe store in Washington, D.C., for Townsend to sell shoes.  Townsend was also making drug sales throughout the day.  Townsend had a handgun, which Skinner touched at some point while in the car, and which "could have been ... under a seat or in the center console ...."  After stopping at a gas station, Williams dropped Hall and Skinner off around 8:00 p.m. and continued alone with Townsend. Skinner did not see any bullet holes in the seats or door of Williams' car when he was dropped off.
> One resident of Holly Avenue testified that he heard gunshots around 8:30 p.m. and looked out his window to see a man next to a black car.  He described the man as standing over another person—who first responders later identified as Townsend—on the ground.  According to the witness, the man leaned down, almost touching Townsend, and asked him if he was alright.  The man jumped into the car and sped away.  Another neighbor heard "five or six gunshots" around that time.
> First responders attempted to aid Townsend but, failing to detect a pulse, declared him deceased at 8:37 p.m.  The assistant medical examiner who conducted an autopsy testified that Townsend was hit with seven bullets; she recovered six bullets from Townsend's body.  She testified that four of the gunshot wounds were "rapidly fatal."  One bullet hit the base of his spinal column, which would have been immobilizing.  The wound paths were generally from left to right, front to back, and slightly downwards.  Four bullets entered Townsend's left arm before penetrating his torso.
> Detectives testified about physical evidence recovered from Williams' car, bedroom, and the scene of the shooting.  Investigators recovered three nine-millimeter cartridge cases from the scene and one from Williams' car.  The firearms examiner testified that the cartridges were all

---

[3]As a result of our holdings, the Court of Special Appeals's order of a limited remand—the correctness of which is not before us—remains in effect.

fired from one gun.  Forensic analysts who processed the car recovered a nine-millimeter bullet from the rear passenger-side door.  According to the firearms examiner, the bullets were also fired from one gun.  Analysts observed bullet holes in the front and rear passenger seats.  Using a trajectory rod, they determined that the bullet lodged in the door was fired from the direction of the front left of the car and passed through the front and rear passenger seats.  Photos of the trajectory rod analysis were entered as evidence.  Investigators discovered a substance that was likely blood on the driver-side floormat.  They also discovered a substance that was likely blood on the heel of one of Williams' shoes.  The substance was invisible to the naked eye.  Townsend could not be excluded as a significant contributor to the DNA profiles recovered from the substances.

Williams returned home on the evening of December 14 before 9:00 p.m. and did not park in front of his home.  Detectives ultimately found his car on December 16 after Williams moved the car to a spot in front of his home that morning.  Williams' mother told detectives that it was unusual for him not to park in front of his home or at a nearby lot.  The day after the shooting, Williams stayed home all day and cleaned his bathroom with bleach.  The bleach odor was so strong that Williams' mother asked him to turn on the bathroom exhaust fan.  Williams' mother told detectives that it was unusual for Williams to stay home all day and unusual for him to clean the bathroom with bleach.  Skinner eventually learned of Townsend's death when he spoke to Williams over the phone on December 15.  Williams told Skinner that he had dropped Townsend off at a liquor store in Waldorf at 7:00 p.m.  Skinner found this strange because the group was still driving together at that time.  Williams also told Townsend's mother and brother that he dropped Townsend off at a liquor store in Waldorf.

Williams, 251 Md. App. at 567-69, 254 A.3d at 582-83 (ellipses in original).  Before trial,

in a motion concerning a bill of particulars, the State described its theory of the case, which

included the allegation that Williams fatally shot Townsend.[4]

---

[4]A bill of particulars is "[a] formal, detailed statement of the claims or charges brought by a plaintiff or a prosecutor, usu[ally] filed in response to the defendant's request for a more specific complaint."  *Bill of Particulars*, Black's Law Dictionary (11th ed. 2019).  Williams filed a demand for a bill of particulars and the State filed a response, contending that it was not required to provide a bill of particulars.  Later, however, the State filed a "Motion to Amend the Bill of Particulars" even though it had not provided one.  In the motion, the State included the factual allegation that Williams "shot []

**Jury Instructions, Verdicts, Motion for a New Trial, and Motion to Strike**

The circuit court instructed the jury on second-degree murder, first-degree assault, and use of a firearm in the commission of a felony[5] as follows:

> Homicide second-degree murder.  Second-degree murder is the killing of another person with either the intent to kill, or the intent to inflict such serious bodily harm that death would be the likely result.  Second-degree murder[] does not require premeditation or deliberation.
> In order to convict the defendant of second-degree murder, the State must prove, 1) that the defendant caused the death of [] Townsend, and 2) that the defendant engaged in the deadly conduct either with the intent to kill, or with the intent to inflict such serious bodily harm that death would be the likely result.
> First-degree assault.  The defendant is charged with the crime of first-degree assault.  In order to convict the defendant of first-degree assault, the State must prove all of the elements of second-degree assault, and also must prove that the defendant used a firearm to commit the assault.

> \* \* \*

> Definition of assault.  Assault is causing offensive physical contact to another person.  In order to convict the defendant of assault, the State must prove[,] 1) that the defendant caused physical harm to [] Townsend, 2) that the conduct . . . I'm sorry, that the contact was the result of an intentional or reckless act of the defendant and was not accidental, and 3) that the contact was not legally justified.

> \* \* \*

> Weapons, use of a handgun or firearm in the commission of a felony

---

Townsend seven times in his upper body causing his death."  Williams filed exceptions to the motion, arguing that the State had still not provided a sufficient bill of particulars.  On March 15, 2018, the circuit court conducted a hearing, granted the State's motion, and denied Williams's exceptions.

[5]The circuit court instructed the jury on use of a firearm in the commission of a felony rather than use of a firearm in the commission of a crime of violence. That is of no consequence because second-degree murder and first-degree assault are both crimes of violence and felonies.  See Md. Code Ann., Pub. Safety (2003, 2011 Repl. Vol.) § 5-101(c)(3), (11); Md. Code Ann., Crim. Law (2002, 2012 Repl. Vol.) §§ 2-204(b), 3-202(c).

or crime of violence. The defendant is charged with the crime of use of a firearm in the commission of a felony. The felonies in this case are first-degree murder and first-degree assault.

In order to convict the defendant, the State must prove, 1) that the defendant committed the felonies, and 2) that the defendant used a firearm in the commission of the felonies.

* * *

Use of a firearm includes brandishing, displaying, striking with, firing, or attempting to fire a firearm in the furtherance of the felonies.

A person uses a firearm when he uses it to create fear of harm. The defendant need not injury [sic] anyone with the firearm. Mere possession of a firearm at or near the crime scene is not sufficient.

(Ellipsis in original).

After deliberating, the jury returned verdicts of guilty as to second-degree murder, possession of a regulated firearm while under the age of twenty-one,[6] and wearing, carrying, or transporting a handgun in a vehicle. The jury found Williams not guilty of first-degree murder, use of a firearm in the commission of crime of violence (second-degree murder), and first-degree assault. The courtroom clerk polled the jurors without incident.

Immediately afterward, Williams's counsel requested a bench conference and objected. Williams's counsel contended that the guilty verdict as to second-degree murder

---

[6]The verdict sheet and the courtroom clerk's questions of the foreperson of the jury included the term "being a minor in possession of a firearm[.]" The State charged Williams with violating Md. Code Ann., Pub. Safety (2003, 2011 Repl. Vol.) ("PS") § 5-133(d), under which, with limited exceptions, "a person who is under the age of 21 years may not possess a regulated firearm." PS § 5-133(d)(1). At trial, Williams's mother testified as to his date of birth, which indicated that Williams was twenty when Townsend was fatally shot on December 14, 2017. Although Williams was not a minor at the time, he was under twenty-one and thus prohibited from possessing a regulated firearm under PS § 5-133(d)(1).

was legally inconsistent with the not-guilty verdict as to first-degree assault because the latter is a lesser-included offense of the former. In explaining the basis for the objection, Williams's counsel stated that "maybe it is just a logically, just bizarre verdict, and they have some other reason they acquitted him." The State indicated that Williams's counsel had suggested that the verdicts are factually inconsistent. Williams's counsel countered that he had never "uttered the phrase, factually inconsistent." Williams's counsel requested that the circuit court have the jury resume deliberations and that it instruct the jury to find Williams not guilty of second-degree murder if the jury did not believe that he used a firearm to commit assault. The State took the position that the verdicts were not legally inconsistent because neither first-degree assault nor use of a firearm in the commission of a crime of violence is a lesser-included offense of second-degree murder.

The circuit court denied Williams's counsel's request to have the jury resume deliberations. Next, Williams's counsel requested that the circuit court declare a mistrial as to "Count 3[.]"[7] Williams's counsel argued that, in the bill of particulars, the State alleged that Williams engaged in only one act involving a firearm. Williams's counsel contended that the not-guilty verdict as to first-degree assault precluded the jury from finding Williams guilty of second-degree murder. The circuit court ruled that the verdicts would remain as rendered. Williams's counsel asked the circuit court to note an objection

---

[7]In requesting a mistrial, it appears that Williams's counsel inadvertently used the term "Count 3[.]" The indictment reflects that Count 3 was first-degree assault, an offense for which the jury had returned a verdict of not guilty. In saying the term "Count 3," it appears that Williams's counsel was referring to the third question on the verdict sheet, which pertained to second-degree murder.

to the hearkening and recordation of the verdicts that he alleged to be inconsistent.

The jury verdicts were hearkened without incident. When dismissing the jury, the circuit court advised the jurors that the attorneys might want to talk to them, and that it was up to the jurors whether to do so. The circuit court took a recess.

After the recess, Williams's counsel asked the circuit court to release Williams pending sentencing and stated that he had spoken with five of the jurors. Williams's counsel advised that the jurors he spoke with purportedly stated that they did not believe that Williams was responsible for the shooting. The circuit court declined to change the status of Williams's bond.

Williams's counsel filed a motion for a new trial, contending that the circuit court erred in permitting legally inconsistent verdicts and in not instructing the jury to resume deliberations and reach consistent verdicts. Williams's counsel advised that, after he spoke with jurors on the last day of the trial, one of the jurors contacted a member of the defense team and indicated that the juror wanted to speak further. Williams's counsel stated that a member of the defense team met and spoke with the juror. Williams's counsel attached to the motion for a new trial an affidavit dated July 10, 2019, made by the juror who reached out to his office after trial, that contained allegations concerning the jury's deliberations. Williams's counsel asserted that information provided by jurors after trial, including the one juror's affidavit, indicated that the jury misinterpreted the jury instructions on second-degree murder and other matters.

The State filed an opposition to the motion for a new trial in which the State moved to strike any reference to statements allegedly made by jurors. The State observed that,

under case law and Maryland Rule 5-606, it is impermissible to use information obtained from a juror about the jury's deliberations to impeach a verdict.

On August 23, 2019, the circuit court conducted a hearing on the motion for a new trial and the motion to strike. After hearing arguments on the motion to strike, the circuit court granted the motion, sealed the affidavit, and stated that it would disregard the comments that Williams's counsel made on the last day of trial about statements alleged to have been made by some of the jurors. After hearing arguments on the motion for a new trial, the circuit court took the matter under advisement. On September 12, 2019, after brief remarks from counsel, the circuit court ruled orally from the bench, denying the motion for a new trial. On the same date, the circuit court issued an order to that effect. On September 30, 2019, Williams filed a notice of appeal.

## Opinion of the Court of Special Appeals

In an opinion dated July 7, 2021, the Court of Special Appeals held that the guilty verdict as to second-degree murder is not legally inconsistent with the not-guilty verdict as to first-degree assault because the latter is not a lesser-included offense of the former. See Williams, 251 Md. App. at 541, 254 A.3d at 567. The Court of Special Appeals concluded that the circuit court did not abuse its discretion in denying the motion for a new trial because the substance of the motion and attached affidavit was prohibited under Maryland Rule 5-606(b). See id. at 573, 254 A.3d at 586. The Court of Special Appeals determined that the evidence was sufficient to support the convictions for second-degree murder and possession of a regulated firearm while under the age of twenty-one. See id. at 567, 254 A.3d at 582.

**Petitions for Writs of *Certiorari***

On August 25, 2021, through counsel, Williams petitioned for a writ of *certiorari*, raising the following three issues:

> I. Did the Court of Special Appeals err in finding the verdict was not impermissibly inconsistent?
>
> II. In what circumstances does the no-impeachment rule set forth in Maryland Rule 5-606(b) yield to a defendant's constitutional rights and a jury's true verdict?
>
> III. Did the Court of Special Appeals err in holding there was sufficient evidence to convict [] Williams of second-degree murder and possession of a firearm by a person younger than twenty-one?

We granted the petition.[8]  See Williams, 476 Md. 262, 261 A.3d 239.

## DISCUSSION

### I. Allegedly Inconsistent Verdicts

### The Parties' Contentions

Williams contends that the guilty verdict as to second-degree murder is legally inconsistent with the not-guilty verdicts as to first-degree assault and use of a firearm in the commission of a crime of violence because the jury could not have reached the verdicts without failing to follow the jury instructions given by the circuit court.  Williams states that he does not dispute that the jury instructions on the offenses at issue were correct or that, in the abstract, separate from the allegations made by the State in the charging

---

[8]On July 29, 2021, on his own behalf, Williams petitioned for a writ of *certiorari*. On August 3, 2021, through counsel, Williams filed a line explaining that he filed the petition before having legal representation and that he intended to file a superseding petition.  The initial petition was denied.

documents, the offenses do not satisfy the required evidence test. Williams argues, however, that, even if the offenses do not satisfy the required evidence test, verdicts as to the offenses are legally inconsistent where the verdicts indicate that the jury failed to follow jury instructions. Williams asserts that, in this case, the jury failed to follow the jury instructions on second-degree murder, the presumption of innocence, the burden of proof, and the requirement to decide this case based only on the evidence. Williams maintains that this is shown by the circumstance that the jury found him guilty of second-degree murder even though, as indicated by the not-guilty verdicts, the jury determined that the State had not proven beyond a reasonable doubt that he fatally shot Townsend. Williams contends that, even if the verdicts are not legally inconsistent, they cannot stand because they are "logically inconsistent."

The State responds that the guilty verdict as to second-degree murder is not legally inconsistent with the not-guilty verdict as to first-degree assault because, under the required evidence test, the latter is not a lesser-included offense of the former.[9] The State argues

---

[9]The State contends that Williams failed to preserve for appellate review the issue of whether the guilty verdict as to second-degree murder is legally inconsistent with the not-guilty verdict as to use of a firearm in the commission of a crime of violence because he did not raise the issue in the circuit court. The State acknowledges, though, that the outcome under the required evidence test would be the same if the not-guilty verdict for use of a firearm in the commission of a crime of violence were considered. In our view, the State is correct that Williams did not preserve a challenge as to legal inconsistency of the verdicts based on the not-guilty verdict as to the use of a firearm in the commission of a crime of violence. But, because Williams raised in the circuit court the core issue of the legal inconsistency of his acquittal of an offense that was committed through use of a firearm—namely, whether the guilty verdict as to second-degree murder is legally inconsistent with the not-guilty verdict as to first-degree assault, an offense that was alleged to have been committed with the use of a firearm, we will treat the issue as preserved. The State is also correct, though, that the outcome of the analysis is the same.

- 13 -

that Williams essentially asks us to deviate from our case law by considering the facts of the case—as opposed to comparing the elements of the offenses at issue—in determining whether the verdicts are legally inconsistent. In addition, the State asserts that Williams in effect requests that we overrule McNeal by holding that neither factually nor logically inconsistent verdicts can stand in criminal jury trials. The State maintains that we should decline the invitation.

## Standard of Review

An appellate court reviews without deference a trial court's conclusion as to whether a guilty verdict and a not-guilty verdict are legally inconsistent. See Givens v. State, 449 Md. 433, 447, 144 A.3d 717, 725 (2016).

## Case Law on Inconsistent Verdicts

In Price v. State, 405 Md. 10, 12, 29, 949 A.2d 619, 620, 630 (2008), we overruled the "Maryland common law principle that inconsistent jury verdicts are normally permissible in criminal jury trials" and held that "inconsistent verdicts shall no longer be allowed" in such trials. In Price, we did not specifically indicate whether the new prohibition would apply to legally inconsistent verdicts, factually inconsistent verdicts, or both. That said, the circumstances of Price clearly involved legally inconsistent verdicts rather than factually inconsistent ones, as the jury found the defendant guilty of possession of a firearm during and in relation to a drug trafficking offense and not guilty of all drug trafficking offenses charged. See id. at 15, 949 A.2d at 622; see also McNeal, 426 Md. at 463, 44 A.3d at 987.

In McNeal, id. at 461-62, 44 A.3d at 986, we clarified that the prohibition announced

- 14 -

in Price applies only to legally inconsistent verdicts, not jury verdicts "that are merely inconsistent factually, illogical, or 'curious.'" Unlike Price, McNeal involved a factual inconsistency rather than a legal inconsistency, as the jury found the defendant guilty of possession of a regulated firearm by a disqualified person and not guilty of wearing, carrying, or transporting a handgun. See McNeal, 426 Md. at 472, 44 A.3d at 992. We determined that the verdicts were not legally inconsistent because each offense has a unique element—*i.e.*, neither is a lesser-included offense of the other. See id. at 472, 44 A.3d at 992-93. We explained that, in a criminal case tried by a jury, although a court can determine whether verdicts are legally inconsistent, there may be various explanations for factually inconsistent verdicts, including lenity, mistake, or compromise. See id. at 472-73, 44 A.3d at 992-93. We explained that evaluating the jury's considerations in reaching its verdict would involve pure speculation or necessitate an inquiry into the jury's deliberations. See id. at 473, 44 A.2d at 993. We unequivocally stated that a court should not "inquire into the details of the deliberations" and that we would "not risk disturbing a verdict for the wrong reasons." Id. at 472-73, 44 A.3d at 992-93 (citation omitted).

We explained that practical considerations concerning how a trial court might correct factually inconsistent verdicts weighed against applying the holding in Price to such verdicts. See McNeal, 426 Md. at 471, 44 A.3d at 992. The process for correcting legally inconsistent verdicts after timely objection involves the trial court sending the jury back for further deliberations to potentially reach a different verdict as to at least one of the offenses and, if applied to factually inconsistent verdicts, would risk invading the province of the jury with regard to factual determinations. See id. at 471, 44 A.3d at 992. We

explained that prohibiting factually inconsistent verdicts in criminal jury trials would create practical problems because, if a jury reached factually inconsistent verdicts and the trial court instructed the jury to resume deliberating and reach verdicts that were not factually inconsistent, the instruction could "be construed by the jurors as a suggested outcome, or that their original conclusions are deemed incorrect." Id. at 471-72, 44 A.3d at 992. We stated that, by allowing factually inconsistent verdicts in criminal jury trials, "we reaffirm[ed] the historic role of the jury as the sole fact-finding body in" such trials. Id. at 472, 44 A.3d at 992.

In State v. Stewart, 464 Md. 296, 301-02, 211 A.3d 371, 374 (2019) (per curiam), in addressing the issue of inconsistent verdicts, we held that a conviction for robbery should not have been reversed on the ground that it was inconsistent with an acquittal of second-degree assault of the intent-to-frighten type.[10] Although a five-judge majority of this Court reached this conclusion, they did so for different reasons. See id. at 301-02, 211 A.3d at 374 (per curiam). Three judges opined that reversal of the conviction was unwarranted because the verdicts did not indicate that the jury failed to follow the jury instructions on the offenses at issue, which were correct and generated by the evidence. See id. at 307-08, 211 A.3d at 378 (McDonald, J., writing separately). That opinion took the position that, in determining whether verdicts are inconsistent, the key issue is whether the verdicts indicate

---

[10]In Stewart, the Court of Special Appeals reversed the defendant's conviction for robbery, holding that it was legally inconsistent with the acquittal as to assault because the assault was a lesser-included offense of robbery. See Stewart, 464 Md. at 300, 211 A.3d at 373 (per curiam). A majority of this Court agreed to reverse the Court of Special Appeals's judgment and affirm the defendant's conviction for robbery. See id. at 301, 211 A.3d at 374 (per curiam).

on their face that the jury failed to follow proper jury instructions on the offenses at issue, not whether the verdicts are legally inconsistent or factually inconsistent. See id. at 304-05, 211 A.3d at 376 (McDonald, J., writing separately).

The other two judges in the majority who concluded that reversal of the conviction was unwarranted and two additional judges who would have affirmed the judgment of the Court of Special Appeals were in agreement that, consistent with our holding in McNeal, the Court's analysis should distinguish between legally inconsistent verdicts and factually inconsistent verdicts. See Stewart, 464 Md. at 308-09, 211 A.3d at 378-79 (Watts, J., writing separately); id. at 335-36, 211 A.3d at 394-95 (Greene, J., concurring and dissenting); id. at 34243, 211 A.3d at 398-99 (Hotten, J., dissenting). The two judges who were in the majority as to the outcome of the case concluded that reversal of the conviction was unwarranted because the verdicts were not legally inconsistent and determined that second-degree assault of the intent-to-frighten type is not a lesser-included offense of robbery and that the jury instructions on both offenses were correct. See id. at 308, 310, 211 A.3d at 378-79 (Watts, J., writing separately). Their opinion took the position that, in determining whether verdicts are legally inconsistent, a court must confirm whether the jury instructions on the offenses at issue were correct and ascertain whether the offense of which the jury found the defendant not guilty is a lesser-included offense of the one of which the jury found the defendant guilty. See id. at 310, 211 A.3d at 379 (Watts, J., writing separately).

The two judges who were not in the majority as to the outcome agreed that it was necessary to determine whether the verdicts were legally inconsistent by ascertaining

whether one of the charged offenses was a lesser-included offense of another, but would have concluded that the second-degree assault offense at issue was a lesser-included offense of robbery and thus the verdicts were legally inconsistent. See id. at 335-36, 342, 211 A.3d at 394-95, 398 (Greene, J., concurring and dissenting); see id. at 342-43, 211 A.3d at 398-99 (Hotten, J., dissenting). Writing separately, one of the judges, the Honorable Clayton Greene, Jr., explained:

> The majority view of this Court is to affirm our pronouncement in *Price* and *McNeal* that legally inconsistent verdicts will not be tolerated in Maryland. In addition, a majority of the Court agrees that a two-step inquiry is required for determining whether a verdict is legally inconsistent. This process is outlined, accurately in my view, in Judge Watts's opinion in this case, having been first explicated in *Price* and *McNeal* and maintained by their progeny. In sum, a reviewing court must first confirm that the trial judge correctly instructed the jury regarding the two crimes' elements. Then, the judge must ascertain whether a crime for which the defendant was found not guilty is a lesser included offense of the crime for which the jury found the defendant guilty.

Stewart, 464 Md. at 335, 211 A.3d at 394 (Greene, J., concurring and dissenting) (citations omitted). Writing separately, the second judge, the Honorable Michele D. Hotten, stated: "I agree with the two-step inquiry required for the determination of legally inconsistent verdicts, as provided in Judge Watts's opinion. I do not believe we should depart from tenets of *stare decisis* by reconsidering the approach to determining inconsistent verdicts, as the plurality contends." Id. at 342, 211 A.3d at 398 (Hotten, J., dissenting) (footnote omitted).[11] Thus, in Stewart, while a majority of the Court agreed on the outcome of

---

[11]As such, both judges endorsed maintaining the distinction between legally and factually inconsistent verdicts. And, both judges applied the required elements test and concluded that second-degree assault is a lesser-included offense of robbery and that,

reversal of the judgment of the Court of Special Appeals for different reasons, a four-member majority of the Court agreed that the distinction between legally and factually inconsistent verdicts should remain, that legally inconsistent verdicts are not permissible, and that such verdicts occur where an offense of which the defendant is found not guilty is a lesser-included offense of an offense of which the defendant is found guilty. As such, Stewart did not undermine or abrogate the analysis set forth by this Court in McNeal.

**Analysis**

Here, we conclude that the guilty verdict as to second-degree murder is not legally inconsistent with the not-guilty verdicts as to first-degree assault and use of a firearm in the commission of a crime of violence because the jury instructions on the offenses at issue were correct and neither of the offenses at issue of which Williams was acquitted is a lesser-included offense of second-degree murder. In reaching this conclusion, consistent with our case law, we consider the instructions given to the jury on the offenses at issue and the elements of the offenses. This approach is compelled by the analysis endorsed by the majority of the Court in Stewart and by McNeal, in which, when determining whether verdicts were legally inconsistent, we considered the jury instructions as to the offenses at issue and the elements of the offenses, not the facts of a particular case. See Stewart, 464 Md. at 301-02, 211 A.3d at 374-75 (per curiam); McNeal, 426 Md. at 472, 44 A.3d at 992-

therefore, the verdicts were legally inconsistent. In other words, four members of the Court concluded that the distinction between legally and factually inconsistent verdicts in criminal jury trials firmly recognized in McNeal should be upheld. There was no deadlock or split between the four judges as to upholding the distinction set forth in McNeal, and, as discussed below, there is no basis under the principle of *stare decisis* on which to overrule McNeal.

- 19 -

93. In other words, we do not, as Williams has suggested, examine whether information in the charging documents, bill of particulars, or evidence adduced at trial, *i.e.*, the facts of the case, demonstrate that the jury has reached legally inconsistent verdicts. It is logical that we do not address the facts of a case in ascertaining whether verdicts are legally inconsistent, given that the question necessarily involves a legal determination. Undoubtedly, the facts of a case would be relevant to the review of an alleged factual inconsistency. But, as we held in McNeal, factually inconsistent verdicts are permissible in criminal jury trials. See id. at 461-62, 44 A.3d at 986. We will not intrude upon the province of the jury in an attempt to reconcile factual inconsistencies.

Although Williams does not explicitly ask us to overrule Stewart or McNeal and instead contends that factually and legally inconsistent verdicts are equally offensive, there would be no way for us to adopt his position—that the State's theory of the case leads to the conclusion that the verdicts are inconsistent—without abandoning the analysis that we applied in Stewart and McNeal and abrogating our holdings in the cases. The crux of Williams's argument is that the indictment, the bill of particulars, and the evidence presented at trial indicate that he fatally shot Townsend, as opposed to killing him by any other method, and therefore the not-guilty and guilty verdicts are inconsistent. This allegation inextricably pertains to the facts of the case. But, evaluating whether the jury reached inconsistent verdicts based on the facts of the case would be contrary to the approach in Stewart and McNeal.

We are not persuaded by Williams's attempt to circumvent the analysis used in Stewart and McNeal by arguing that verdicts are legally inconsistent where the facts or

circumstances of the case indicate that the jury failed to follow jury instructions. Williams's contention appears to be at least based in part on the discussion in one of the opinions in Stewart that where verdicts are legally inconsistent there is an indication that the jury failed to follow jury instructions. See Stewart, 464 Md. at 301, 211 A.3d at 374 (per curiam); id. at 305-08, 211 A.3d at 376-78 (McDonald, J., writing separately). Quoting Stewart, id. at 305, 211 A.3d at 376 (McDonald, J., writing separately), Williams states that "[t]he real concern with a seemingly inconsistent verdict is not what label we can attach to it, but whether the jury disregarded the trial court's instructions on the law in reaching a guilty verdict on a particular count."[12] Relying on this, Williams argues that, regardless of whether the inconsistency is factual or legal, inconsistent verdicts are not permitted because they may be the result of a jury not following instructions. Read as a whole, Stewart and McNeal make clear that legally inconsistent verdicts are impermissible

---

[12]Williams's argument seems to be that, in his view, there is an indication that the jury did not follow jury instructions such as the instruction on the burden of proof and the presumption of innocence, and that this is a basis for determining that the verdicts are inconsistent. However, the language from the opinion in Stewart that Williams quotes does not support his contention. See Stewart, 464 Md. at 305, 211 A.3d at 376 (McDonald, J., writing separately). The opinion stated that the jury instructions to be considered in determining whether verdicts are inconsistent are the jury "instructions on the law governing the charged offenses." Id. 464 Md. at 305, 211 A.3d at 376 (McDonald, J., writing separately) (footnote omitted). Additionally, the opinion began its analysis of the circumstances of the case by observing that there was "no dispute that the jury instructions were generated by the evidence at trial and accurately described the elements of the offenses with which [] Stewart was charged." Id. at 307, 211 A.3d at 378 (McDonald, J., writing separately).

and that such verdicts occur where a jury reaches irreconcilable verdicts that demonstrate it failed to follow jury instructions on the offenses at issue where the trial court's instructions as to the offenses are correct and the offenses have the same elements. See Stewart, 464 Md. at 310, 211 A.3d at 379 (Watts, J., writing separately); McNeal, 426 Md. at 458, 44 A.3d at 984. Neither Stewart nor McNeal supports Williams's position that we must examine the facts of a case to determine whether a jury's verdict in a criminal case is impermissibly inconsistent.

In addition, in his endeavor to have us examine the facts of his case as part of the analysis, Williams relies on the following sentence from an opinion in Stewart: "An analysis of the circumstances of this case reveals that Stewart's conduct satisfied the elements of robbery, but not those of second-degree assault of the intent-to-frighten type." Stewart, 464 Md. at 330, 211 A.3d at 391 (Watts, J., writing separately). This sentence in Stewart, however, came immediately after an analysis that illustrated that it is possible to commit robbery without committing second-degree assault of the intent-to-frighten type, as was the case in Stewart. See id. at 328-30, 211 A.3d at 390-91 (Watts, J., writing separately). Williams overlooks that the opinion in Stewart explained in detail the holding in McNeal that factually inconsistent verdicts are permissible in criminal jury trials and that the opinion expressly concluded that, to determine whether a guilty verdict and not-guilty verdict are legally inconsistent, a court must apply the test explained above, which involves a review of the instructions as to the offenses and the elements of the offenses. See Stewart, 464 Md. at 310, 317, 211 A.3d at 379, 383-84 (Watts, J., writing separately). Nothing in the opinion from which the statement comes supports the contention that

resolution of the issue of whether verdicts are legally inconsistent may depend on the facts of a particular case.

On brief, the State brings up, that, in Hemming v. State, 469 Md. 219, 230, 263-64 & n.18, 229 A.3d 825, 831, 851 & n.18 (2020), a case in which this Court held that a "bifurcated hybrid trial procedure split between two factfinders" was not permitted, in explaining that such a procedure could lead to inconsistent verdicts, the Court suggested in a footnote that it no longer recognized a distinction between legally and factually inconsistent verdicts and points out that from its perspective the suggestion appeared to be "an error" as opposed to a change in law. It is correct that in a footnote in Hemming, we remarked that such a distinction had been rejected and referred to Stewart as "holding that the permissibility of an inconsistent jury verdict depends on 'whether the jury verdict on its face indicates that the jury failed to follow the trial court's proper instructions on the law governing the charged offenses[.]'" Hemming, 469 Md. at 264 n.18, 229 A.3d at 851 n.18 (quoting Stewart, 464 Md. at 305, 211 A.3d at 376 (McDonald, J., writing separately)). The footnote appears to refer to the opinion of the three judges in Stewart whose approach to determining inconsistent verdicts would focus mainly on a review of the jury instructions on the offenses. The footnote did not address the circumstance that, in Stewart, four members of the Court explicitly endorsed upholding the approach set forth in McNeal as to distinguishing between legally and factually inconsistent verdicts and the holding in McNeal that legally inconsistent verdicts are not permissible while factually inconsistent verdicts in criminal jury trials are permissible. It is clear that in Stewart, this Court did not overrule McNeal or the use of the required evidence test in determining the

existence of legally inconsistent verdicts. In addition, later, after <u>Hemming</u>, in <u>State v. Sayles</u>, 472 Md. 207, 244, 244 A.3d 1139, 1160-61 (2021), this Court reaffirmed the holding in <u>McNeal</u> and the distinction between legally and factually inconsistent verdicts.

Having explained that, under <u>Stewart</u> and <u>McNeal</u>, a determination as to whether verdicts are legally inconsistent involves an examination of the jury instructions given on the offenses and the elements of the offenses at issue, we turn to the alleged inconsistency in this case. It is undisputed that the jury instructions accurately conveyed the elements of all three of the relevant offenses. In determining whether there is a legal inconsistency, the next step is to compare the elements of the offenses and resolve the question of whether, under the required evidence test, the offense of first-degree assault, where the modality of the commission of the offense is the use of a firearm, or use of a firearm in the commission of a crime of violence is a lesser-included offense of second-degree murder. The answer is no.

"Under the required evidence test—also known as the same evidence test, Blockburger test, or elements test—Crime A is a lesser-included offense of Crime B where all of the elements of Crime A are included in Crime B, so that only Crime B contains a distinct element." <u>State v. Wilson</u>, 471 Md. 136, 178, 240 A.3d 1140, 1164 (2020) (citation omitted). The offenses of first-degree assault (involving the use of a firearm) and use of a firearm in the commission of a crime of violence have an element—specifically, the use of a firearm—that second-degree murder lacks. This analysis demonstrates that the not-guilty verdicts were not as to a lesser-included offense of second-degree murder and that there is no legal inconsistency in the verdicts.

We cannot embrace Williams's contention that, even if not legally inconsistent with the acquittals, the verdict for second-degree murder cannot stand because it is "logically inconsistent" with the acquittals. The term "logically inconsistent" appears to be a euphemism that Williams uses to avoid use of the term "factually inconsistent." As we explained in <u>McNeal</u>, the terms "logically inconsistent" and "factually inconsistent" are virtually synonymous. <u>See</u> <u>McNeal</u>, 426 Md. at 458-59 & n.2, 462, 44 A.3d at 984 & n.2, 986. As such, Williams's contention that the verdicts are logically inconsistent is nothing more than an argument that the verdicts are factually inconsistent, which under our holding in <u>McNeal</u> is a permissible outcome in criminal jury trials.

To the extent that Williams implicitly seeks to have us overrule <u>McNeal</u>, we decline the request and reaffirm our conclusion that factually inconsistent verdicts are permissible in criminal jury trials. "Under the doctrine of *stare decisis*, an appellate court may overrule a case that either was clearly wrong and contrary to established principles or has been superseded by significant changes in the law or facts." <u>Scott v. State</u>, 454 Md. 146, 183, 164 A.3d 177, 198 (2017), <u>cert. denied sub nom.</u> <u>Scott v. Maryland</u>, 138 S. Ct. 652 (2018) (cleaned up). Neither of these circumstances exists as to <u>McNeal</u>. Far from being clearly wrong or having been superseded, our holding in <u>McNeal</u> remains good law. In three separate opinions—which were issued just three years ago— four judges of the Court in <u>Stewart</u> were in favor of upholding the approach in <u>McNeal</u> distinguishing between legally and factually inconsistent verdicts. As recognized in <u>McNeal</u>, prohibiting factually inconsistent verdicts in criminal jury trials would result in trial courts invading the province of the jury by inquiring into deliberations and would prevent juries from reaching factually

inconsistent verdicts as a result of lenity or compromise. See McNeal, 426 Md. at 471-73, 44 A.3d at 992-93.

Tellingly, on brief, Williams cites only one case in which a court in another jurisdiction has prohibited factually inconsistent verdicts in criminal jury trials—the fifty-two-year-old Alaska case of DeSacia v. State, 469 P.2d 369, 377 (Alaska 1970). In McNeal, citing DeSacia, we observed that "Alaska, as it turns out, is the sole state to take a position rejecting both factually and legally inconsistent verdicts." McNeal, 426 Md. at 468-69, 44 A.3d at 990. It would appear that our observation in McNeal is still accurate today, given that Williams does not identify, and we are not aware of, a case from another State that prohibits factually inconsistent verdicts in criminal jury trials.

It is accurate that the verdicts in this case are factually inconsistent—but, for the reasons that we set forth in McNeal, that circumstance does not warrant reversal and instead reflects the role of the jury as the sole arbiter of factual disputes in a criminal jury trial. See id. at 470, 44 A.3d at 991. The verdicts may represent nothing more than compromise or leniency. We are aware that Williams has contended that information provided by some of the jurors indicated that the jury misinterpreted the jury instructions on second-degree murder and other matters—i.e., that the reason for the factual inconsistency was a failure to follow the instructions. As explained below in Part II, however, using as part of our review information obtained from jurors about the jury's deliberations after it reaches a verdict would violate the long-standing "no-impeachment rule," which prevents inquiring into a jury's verdict by consideration of information concerning deliberations obtained from jurors after the verdict. In compliance with the no-impeachment rule and McNeal,

- 26 -

we will not invade the province of the jury by inquiring into its deliberations to ascertain the reason for a factual inconsistency that is permissible under our case law.[13] See McNeal, 426 Md. at 473, 44 A.3d at 993.

Finally, Williams is mistaken in contending that the rule of lenity weighs in favor of vacating the conviction for second-degree murder. Under the rule of lenity, a court may merge a conviction for a statutory offense with another conviction for sentencing purposes where there is no indication that the General Assembly intended for a defendant to receive a separate sentence for each offense. See State v. Johnson, 442 Md. 211, 218, 112 A.3d 383, 387 (2015). As such, the rule of lenity is a potential ground on which an appellate court may vacate a sentence, not a possible basis for an appellate court to reverse or vacate a conviction—let alone to determine that verdicts are legally inconsistent.

For the reasons set forth herein, we conclude that the verdicts in this case are not legally inconsistent and decline to depart from our holding in McNeal that factually inconsistent verdicts are permissible in criminal jury trials.

---

[13]We are not persuaded by Williams's argument that affirming the conviction for second-degree murder would be inconsistent with what he identifies as the principle that a defendant cannot be convicted based on facts that differ from those alleged in an indictment or a bill of particulars. Without going into the case law that Williams says underpins his assertion, we note that this is not a case in which the State made allegations in an indictment or bill of particulars and at trial presented different evidence. Rather, Williams's argument is based on the premise that the reason for the factual inconsistency in the verdicts in this case was a determination by the jury that the State failed to prove that he shot Townsend. As we have explained, factually inconsistent verdicts may arise for many reasons including compromise, juror negotiations, a desire for leniency, or even potentially a mistake. Although we may not know the reason for a factual inconsistency, our case law makes clear that we will not intrude upon a jury's deliberations by requiring that a trial court instruct a jury to resume deliberating to reach a different verdict absent the existence of legally inconsistent verdicts.

- 27 -

## II. The No-Impeachment Rule

### The Parties' Contentions

Williams contends that the circuit court erred in refusing to consider post-verdict statements made by jurors concerning the jury's deliberations, including the affidavit of a juror, and abused its discretion in denying the motion for a new trial. Williams argues that, under the Sixth Amendment, it is improper for the State to invoke the rule that a jury may not impeach its verdict, *i.e.*, the no-impeachment rule, to circumvent a determination that the State failed to prove guilt beyond a reasonable doubt. Williams maintains that this case would represent the first instance in Maryland in which a trial court was allowed to permit the State to invoke the no-impeachment rule to disregard information from a jury indicating that it failed to determine guilt beyond a reasonable doubt.

The State responds that Williams effectively asks us to abrogate Maryland Rule 5-606(b), which contains an explicit prohibition against the use of statements from jurors about the jury's deliberations to impeach verdicts, and that we should decline the request. The State points out that there are very limited exceptions to the no-impeachment rule, which requires that the substance of jury deliberations remain confidential, such as evidence of juror bias or external pressure on a juror, and that William's allegations do not satisfy any of the exceptions. The State argues that adopting Williams's position that the no-impeachment rule should not apply where a jury returns factual or logically inconsistent verdicts would incentivize defendants who are found guilty to pursue jurors for information and seek hearings to undo verdicts. The State maintains that this would result in disturbing the finality of verdicts and undermine the jury system in criminal cases. The State points

out that courts in Maryland and other jurisdictions have consistently applied the no-impeachment rule in declining to review convictions based on information obtained from jurors about the jury's deliberations after a verdict.

**Standard of Review**

Generally, an appellate court reviews for abuse of discretion a trial court's denial of a motion for a new trial. See Grandison v. State, 425 Md. 34, 75, 38 A.3d 352, 376 (2012), cert. denied sub nom. Grandison v. Maryland, 568 U.S. 1093 (2013). However, an appellate court reviews without deference a trial court's interpretation of case law and the Maryland Rules. See Gray v. State, 388 Md. 366, 375, 879 A.2d 1064, 1068 (2005).

**Case Law on the No-Impeachment Rule and Maryland Rule 5-606(b)**

"It has long been the rule in Maryland, without any deviation, that a juror may not impeach his or her verdict." Stokes v. State, 379 Md. 618, 637, 843 A.2d 64, 75 (2004) (citations omitted). See also Colvin-el v. State, 332 Md. 144, 184, 630 A.2d 725, 745 (1993), cert. denied sub nom. Colvin-El v. Maryland, 512 U.S. 1227 (1994) ("The well-settled Maryland rule is that jurors cannot be heard to impeach their verdict." (Citations omitted)). "[O]ne reason for the rule is to protect the secrecy of jury deliberations. . . . [W]hile privacy is not a constitutional end in itself, it is the means of ensuring the integrity of the jury trial itself." Stokes, 379 Md. at 638, 843 A.2d at 75-76 (citations omitted). This is because allowing a juror to impeach a verdict "would disclose the secrets of the jury room and afford an opportunity for fraud and perjury." Id. at 637, 843 A.2d at 75 (citation omitted). Other purposes of the no-impeachment rule include avoiding "harassment of jurors by disgruntled losing parties; removal of an element of finality from judicial

- 29 -

decisions; and through allowing jurors to swear to alleged examples of reprehensible conduct, a decrease in public confidence in the judicial process." Id. at 637, 843 A.2d at 75 (citation omitted).

As the Honorable Charles E. Moylan, Jr. has explained, it has been documented that the prohibition against impeaching a jury's verdict with statements obtained from jurors began as "Lord Mansfield's Rule," a common law principle dating back to a 1785 case in which a jury allegedly decided a matter by flipping a coin. See Cooch v. S & D River Island, LLC, 216 Md. App. 275, 282-83, 85 A.3d 888, 892, cert. denied, 438 Md. 143, 91 A.3d 613 (2014). Lord Mansfield, the person for whom the rule was named, declined to consider a juror affidavit and explained that the only permissible information concerning the basis for the jury's decision would be from a source outside of the jury. See id. at 282-83, 85 A.3d at 892.

The first appellate case in Maryland to recognize the common law principle underlying the no-impeachment rule was Browne v. Browne, 22 Md. 103 (1864). See Cooch, 216 Md. App. at 283, 85 A.3d at 892-93. In Browne, 22 Md. at 113, evidence in the form of affidavits from four jurors, alleging that while deliberating a juror became ill which led to the juror agreeing to the verdict, was excluded. In addition, three other jurors testified that they agreed to the verdict in an effort to assist the juror who was ill. See id. In Browne, the Court determined that such juror impeachment should not be permitted and stated that "[t]o allow a verdict of a jury solemnly rendered, to be afterwards impeached upon such testimony, would, we think, be setting a dangerous precedent, tending in most cases to the defeat of justice." Id. The Court explained: "Although in some of the States

- 30 -

a different practice has been allowed, we think the law in Maryland is well settled, that the testimony of jurors cannot be heard to impeach their verdict, whether the conduct objected to in the jury be misbehaviour or mistake." Id. (cleaned up).

Maryland Rule 5-606(b) codifies the no-impeachment rule.[14] See Dorsey v. State, 185 Md. App. 82, 101, 968 A.2d 654, 665 (2009). The Rule "prevents a juror from impeaching the verdict" and "prohibits inquiry into the juror's mental processes or statements made during deliberations." Stokes, 379 Md. at 641, 637, 843 A.2d at 78, 75 (citation omitted). Maryland Rule 5-606(b) provides in pertinent part:

> (1) In any inquiry into the validity of a verdict, a sworn juror may not testify as to (A) any matter or statement occurring during the course of the jury's deliberations, (B) the effect of anything upon that or any other sworn juror's mind or emotions as influencing the sworn juror to assent or dissent from the verdict, or (C) the sworn juror's mental processes in connection with the verdict.
>
> (2) A sworn juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying may not be received for these purposes.

The language of Maryland Rule 5-606(b) does not contain any exception to the prohibition on permitting a juror to testify as to matters that occurred during the course of a jury's deliberations.

Maryland appellate courts have without fail applied the no-impeachment rule or Maryland Rule 5-606(b) in declining to reverse convictions based on statements by jurors about a jury's deliberations after the jury reached a verdict. In Genies v. State, 426 Md. 148, 160-61, 43 A.3d 1007, 1013-14 (2012), we held that a trial court did not abuse its

---

[14] In the federal system, the principle is set forth in Federal Rule of Evidence 606(b).

discretion in denying without a hearing a motion for a new trial based on the defendant's allegation that, after the trial concluded, one of the jurors "reported to the Jury Commissioner's Office that she had changed her vote during jury deliberations because she had 'felt threatened' by another juror who stated 'If you don't change your vote, I will make sure we all stay here for weeks[.]'" We concluded that the allegations concerning the jury's deliberations could not be heard under Maryland Rule 5-606(b) and applied the principle "that under no circumstances would it be admissible to impeach the juror's own verdict at the hearing of the motion for a new trial." Id. at 161, 43 A.3d at 1014 (cleaned up).

Similarly, in Dorsey, 185 Md. App. at 111, 95, 968 A.2d at 671, 661, the Court of Special Appeals held that a trial court did not err or abuse its discretion in denying a motion for a new trial based on the defendant's allegation that multiple jurors indicated that, during the jury's deliberations, there was discussion of the circumstance that the defendant did not testify. The Court of Special Appeals concluded that "[a]sking the jurors directly about their deliberations, or asking a third party to provide hearsay testimony about the jury deliberations, would have constituted an inquiry into the validity of the verdict" in violation of Maryland Rule 5-606(b). Id. at 110, 968 A.2d at 670.

In contrast, both Maryland appellate courts have discussed, but not applied, the no-impeachment rule in cases where it was possible to establish, without using statements obtained from a juror about a jury's deliberations, that the jury may have been unduly influenced. Such cases are consistent with the principles underlying the no-impeachment rule because they do not stand for the proposition that it is permissible to inquire into the

validity of a verdict based on information obtained from a juror about a jury's deliberations after the verdict. In particular, in Wernsing v. Gen. Motors Corp., 298 Md. 406, 410-13, 470 A.2d 802, 804-05 (1984), we held that, although affidavits by jurors after trial could not properly be used to establish that the jury used a dictionary during its deliberations, testimony by a bailiff and notes from the jury during trial could. We observed that the bailiff's testimony "present[ed] a different situation" than scenarios where the no-impeachment rule applies. Id. at 413, 470 A.2d at 805 (cleaned up). We determined that the jury notes were also "competent proof" because, "[a]s documents generated during the jury's deliberations, they do not suffer the taint of possible post-verdict importuning." Id. at 413, 470 A.2d at 805 (cleaned up).

Similarly, in Smith v. Pearre, 96 Md. App. 376, 390, 625 A.2d 349, 356, cert. denied, 332 Md. 454, 632 A.2d 151 (1993), the Court of Special Appeals determined that it was permissible for a trial court to consider a juror's admission after the trial that, before the trial concluded, the juror watched a television program relevant to the issues in the case. The Court of Special Appeals explained that the juror's admission was not barred under the no-impeachment rule because it involved "extraneous material that occurred outside the sanctity of the jury room." Smith, 96 Md. App. at 390, 625 A.2d at 356 (citation omitted).

**No-Impeachment Rule and United States Supreme Court Case Law**

In Peña-Rodriguez v. Colorado, 580 U.S. ___, 137 S. Ct. 855, 869 (2017), the Supreme Court held "that where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth

Amendment requires that the no-impeachment rule give way[.]" Under such a circumstance, the trial court is permitted to "consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee." Id.

As the wording of the Supreme Court's holding suggests, Peña-Rodriguez involved an instance of racial animus by a juror. After a jury reached guilty verdicts, two jurors averred in affidavits that a third juror stated that he believed that the defendant was guilty because of his race and that the juror did not believe the defendant's alibi witness because of what the juror perceived to be the witness's immigration status. See id. at 861-62. The defendant made a motion for a new trial, which the trial court denied on the ground that, under Colorado Rule of Evidence 606(b), a jury's deliberations are protected from inquiry. See id. at 862. The Supreme Court noted that, like Federal Rule of Evidence 606(b), the Colorado Rule "generally prohibits a juror from testifying as to any statement made during deliberations in a proceeding inquiring into the validity of the verdict." Id.[15]

The Supreme Court observed that its holding "remove[d] that bar" and would allow the trial court to consider the affidavits. Peña-Rodriguez, 137 S. Ct. at 870. The Supreme Court explained that, "[w]hen jurors disclose an instance of racial bias as serious as the one involved in [Peña-Rodriguez], the law must not wholly disregard its occurrence." Id. The Supreme Court pointed out that the alleged statements by the offending juror "were

---

[15]In addition to the general prohibition on a juror testifying as to statements made during deliberations, both Federal Rule of Evidence 606(b) and Colorado Rule of Evidence 606(b) contain limited exceptions that permit a juror to testify about extraneous prejudicial information, outside influences improperly before the jury, and mistakes in entering a verdict on a verdict form. Maryland Rule 5-606(b) does not contain similar language.

egregious and unmistakable in their reliance on racial bias." Id.

The Supreme Court recognized that the version of the no-impeachment rule codified by Federal Rule of Evidence 606(b) "has substantial merit" because it "gives stability and finality to verdicts" and "promotes full and vigorous discussion by providing jurors with considerable assurance that after being discharged they will not be summoned to recount their deliberations, and they will not otherwise be harassed or annoyed by litigants seeking to challenge the verdict." Id. at 864-65. The Supreme Court explained that its observation in Warger v. Shauers, 574 U.S. 40, 51 n.3 (2014), "that there may be extreme cases where the jury trial right requires an exception to the no-impeachment rule must be interpreted in context as a guarded, cautious statement." Peña-Rodriguez, 137 S. Ct. at 866-67. The Supreme Court stated that "[t]his caution is warranted to avoid formulating an exception that might undermine the jury dynamics and finality interests the no-impeachment rule seeks to protect." Id. at 867.

The Supreme Court concluded that cases of racial bias warranted an exception to the no-impeachment rule because "racial bias implicates unique historical, constitutional, and institutional concerns" and is "a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice." Id. at 868-69. The Supreme Court pointed out that "[r]acial bias is distinct in a pragmatic sense as well" because "[t]he stigma that attends racial bias may make it difficult for a juror to report inappropriate statements during the course of juror deliberations." Id. The Supreme Court explained that "address[ing] the most grave and serious statements of racial bias is not an effort to perfect the jury but to ensure that our legal system remains capable of coming ever closer

to the promise of equal treatment under the law that is so central to a functioning democracy." Id. at 868.

## Analysis

Here, we conclude that the circuit court correctly granted the motion to strike statements by jurors referenced in the motion for a new trial and that the circuit court did not abuse its discretion in denying the motion for a new trial. The information obtained from jurors after the verdict that Williams's counsel proffered on the last day of the trial and the averments in the affidavit accompanying the motion for a new trial purported to be statements by jurors about discussions that occurred during the jury's deliberations and the jurors' thought processes during deliberations. None of the information attributed to the jurors involved allegations of racial bias or discrimination or the existence of external influences on the jury. The information proffered by Williams's counsel on the last day of trial as well as the information in the affidavit accompanying the motion for new trial indicated that the jurors who William's counsel spoke with after the verdict revealed, at that time, that they were not convinced that Williams shot Townsend. This type of *post hoc* information from jurors was clearly barred from being received by the circuit court under both the no-impeachment rule and the plain language of Maryland Rule 5-606(b)(1) and (2), which establish that it is improper in an inquiry into the validity of a jury's verdict to consider statements or testimony by a juror about the jury's deliberations obtained after a jury has reached a verdict. See Stokes, 379 Md. at 637, 843 A.2d at 75.

In Genies and Dorsey, we and the Court of Special Appeals, respectively, held that, in light of the no-impeachment rule and Maryland Rule 5-606(b), a trial court did not err

or abuse its discretion in denying a motion for new trial based on post-verdict statements by jurors allegedly concerning matters that occurred during the jury's deliberations. See Genies, 426 Md. at 160-61, 43 A.3d at 1013-14; Dorsey, 185 Md. App. at 111, 95, 968 A.2d at 671, 661. It is important to note that the statements by jurors in Genies and Dorsey included allegations about events such as a juror's purported use of a threat to pressure another juror to vote differently in Genies and a supposed discussion of the circumstance that the defendant did not testify in Dorsey. See Genies, 426 Md. at 160, 43 A.3d at 1013-14; Dorsey, 185 Md. App. at 95, 968 A.2d at 661. Just as the statements by jurors about these matters were barred in Genies and Dorsey, so too are the statements attributed to the jurors in this case. The circumstance that Williams has alleged that information from the jurors in this case indicates that the jury misinterpreted jury instructions, including the instruction on second-degree murder, does not change the analysis. Indeed, similar to the allegation in this case that the jury misinterpreted jury instructions, Dorsey concerned an assertion that the jury "disobeyed explicit jury instructions[.]" Dorsey, 185 Md. App. at 87, 968 A.2d at 657. The statements attributed to the jurors in this case are of no greater significance than the statements by jurors that were prohibited under the no-impeachment rule and Maryland Rule 5-606(b) in Genies and Dorsey and, even if they were, that alone would not be a reason to create an exception to the no-impeachment rule.

Although Williams does not expressly ask us to overrule Genies or Dorsey or to abrogate the no-impeachment rule or Maryland Rule 5-606(b), that is what would occur if we were to adopt his position. Williams in effect seeks an exception to the no-impeachment rule and Maryland Rule 5-606(b) that would apply where a defendant seeks to establish

that a jury reached factually or logically inconsistent verdicts because the jury potentially misunderstood a jury instruction. Such an exception would be unwarranted because factually or logically inconsistent verdicts are permissible in criminal jury trials and our case law does not establish such an exception to the no-impeachment rule.

To date, Maryland appellate courts have not deviated from the no-impeachment rule—*i.e.*, neither this Court nor the Court of Special Appeals has recognized an exception to the no-impeachment rule under Maryland law. See Stokes, 379 Md. at 637, 843 A.2d at 75. In Browne, 22 Md. at 114 (which Williams quotes), we indicated *in dicta* that a case could arise in which it would be necessary for us to allow a juror to impeach a verdict to avoid "violating the plainest principles of justice[,]" but this has not yet occurred as demonstrated by Genies and Dorsey. (Cleaned up). As shown by Wernsing and Smith, the no-impeachment rule is not implicated where possible undue influence on a jury can be established by evidence other than information obtained after the verdict from jurors about the jury's deliberations. See Wernsing, 298 Md. at 410-13, 470 A.2d at 804-05; Smith, 96 Md. App. at 390, 625 A.2d at 356.

Williams contends that, just as an exception to the no-impeachment rule under the Sixth Amendment was warranted in Peña-Rodriguez because of racial bias, an exception is warranted in this case because information about the jury's deliberations obtained from jurors after the verdict indicates that the State failed to prove beyond a reasonable doubt that Williams fatally shot Townsend. In Peña-Rodriguez, 137 S. Ct. at 868-69, the Supreme Court indicated that an exception to the no-impeachment rule is warranted where there is clear evidence of racial bias because such a circumstance gives rise to specific

- 38 -

concerns under the Sixth Amendment of the United States Constitution and is distinct from other juror-related improprieties. We are not convinced by the arguments Williams makes in an attempt to broaden the scope of the Supreme Court's holding in Peña-Rodriguez.

Citing different Supreme Court case law, Williams argues that because the Supreme Court has held that in a criminal case the Sixth Amendment requires a finding of guilt based on proof beyond a reasonable doubt, an application of the no-impeachment rule in this case serves to "relieve the State of its constitutionally mandated burden of proving guilt beyond a reasonable doubt." (Citing Sullivan v. Louisiana, 508 U.S. 275, 280 (1993); In re Winship, 397 U.S. 358, 364 (1970)).  But, the Supreme Court cases that Williams relies on do not involve application of the no-impeachment rule or any exception to the rule.[16]  In addition, Williams's reasoning appears to again be based on the faulty premises that factually inconsistent verdicts in criminal jury trials are impermissible and that in this case the existence of factually inconsistent verdicts could mean only that the jury was not satisfied beyond a reasonable doubt that Williams fatally shot Townsend.

Citing cases from other jurisdictions, Williams asserts that various courts have found exceptions to the no-impeachment rule "in instances of religious bias, ethnic bias, racial bias, the inducement of a juror to agree to a verdict, jurors visiting a crime scene,

---

[16]In Sullivan, 508 U.S. at 276, 281-82, the Supreme Court held that the giving of a constitutionally deficient reasonable doubt jury instruction is not harmless error.  In Winship, 397 U.S. at 359, 368, the Supreme Court concluded that "proof beyond a reasonable doubt is among the essentials of due process and fair treatment required during the adjudicatory stage when a juvenile is charged with an act which would constitute a crime if committed by an adult."  (Cleaned up).

and jurors voting to convict because someone needed to go to prison." (Cleaned up).[17]

However, these cases are neither applicable nor instructive. The cases are distinguishable because, like Peña-Rodriguez, they involve racial bias by a juror, another form of juror prejudice, or a jury being exposed to external influences, or they do not involve an exception to the no-impeachment rule at all. In Tobias v. Smith, 468 F. Supp. 1287, 1289 (W.D.N.Y. 1979), allegations of prejudice arose after trial—before sentencing, a juror supplied an affidavit indicating that it was obvious that the jury, which was composed entirely of people of a different race than the defendant, was prejudiced against the defendant. The United States District Court for the Western District of New York stated that "[t]here can be no quarrel with the proposition that the race of a defendant is an improper consideration for a jury, just as ethnic origin and religion are." Id. at 1291 (citation omitted). The Court discussed the no-impeachment rule and Federal Rule of Evidence 606(b) and stated that "[a] jury member may testify or submit an affidavit as to the existence of any extraneous prejudicial influence, but not as to whether or not that influence operated upon him or another juror." Id. at 1289. The Court stated that "[t]here should be no injection of race into jury deliberations and jurors who manifest racial prejudice have no place in the jury room." Id. at 1291. The Court concluded that a hearing should be held on the question of jury prejudice, at which the parties would have an opportunity to question the jurors. See id.

---

[17]Williams cites Tobias v. Smith, 468 F. Supp. 1287 (W.D.N.Y. 1979), State v. Levitt, 176 A.2d 465 (N.J. 1961), United States v. Villar, 586 F.3d 76 (1st Cir. 2009), Watkins v. State, 229 S.E.2d 465 (Ga. 1976), Cochran v. State, 26 Tenn. 544 (1847), and State v. Blake, 853 S.E.2d 838 (N.C. Ct. App. 2020).

In State v. Levitt, 176 A.2d 465, 467 (N.J. 1961), where a trial court received information that jurors commented on their perception of the defendant's religious affiliation during deliberations, the trial court granted a new trial, finding that the defendant's religion and the religion of his character witnesses had been injected into the jury deliberations. Before the Supreme Court of New Jersey, the State did not challenge the use of a juror's affidavit. See id. The Court concluded that, "[w]here there are sufficient allegations that the jury's verdict was discolored by improper influences," "it makes no difference whether the improper influences occurred inside or outside the jury room." Id. (citations omitted). The Court affirmed the grant of a new trial and held that, although "the trial [court] cannot examine the thought processes of jurors in reaching their verdict, [it] can receive jurors' evidence as to the existence of conditions or the occurrence of events to determine whether they showed an adverse prejudice bearing on the verdict." Id. at 467-69 (citations omitted).

In United States v. Villar, 586 F.3d 76, 87 (1st Cir. 2009), the First Circuit held that a trial court had "the discretion to inquire into the validity of [a] verdict by hearing juror testimony to determine whether ethnically biased statements were made during jury deliberations[.]" The First Circuit stated:

> Although we conclude that the district court erred when it concluded that it had no discretion to hold an inquiry into possible bias in jury deliberations, we emphasize that not every stray or isolated off-base statement made during deliberations requires a hearing at which jury testimony is taken. As courts and commentators have highlighted, the need to protect a frank and candid jury deliberation process is a strong policy consideration. Still, at the other extreme, there are certain rare and exceptional cases involving racial or ethnic prejudice that require hearing jury testimony to determine whether a defendant received a fair trial under

the Sixth Amendment.

*Id.* at 87-88. And Watkins v. State, 229 S.E.2d 465, 469-70 (Ga. 1976) involved juror misconduct which exposed jurors to information concerning the case that had not been admitted into evidence —namely, an unauthorized visit by two jurors to the crime scene in which they gauged the time it took to drive from the scene to the defendant's house.

In Cochran v. State, 26 Tenn. 544, 546-47 (1847), a case that is over 150 years old, the Supreme Court of Tennessee granted a new trial based in part on a juror's allegation that he was induced by other jurors to agree to a guilty verdict even though he believed the defendant to be innocent because the jurors advised that the defendant would not be sent to prison. In Cochran, the Supreme Court of Tennessee did not mention the no-impeachment rule or the concept that the deliberations should remain secret.

Williams alleges that in State v. Blake, 853 S.E.2d 838, 842, 844 (N.C. Ct. App. 2020), the Court of Appeals of North Carolina found an exception to the no-impeachment rule where jurors voted "to convict because someone needed to go to prison." (Cleaned up). Yet, in Blake, *id.* at 848, the Court held that there was structural error where jurors acknowledged to the trial court before judgment in the case was entered that they were unsure that the defendant had committed the crime. In Blake, at the time that the jury returned its verdict in open court, after the jury announced the verdict, the trial court met with the jury in an unrecorded conference and received information from the jury. In remanding the case for a new trial, citing North Carolina Rule of Evidence 606(b) (Competency of juror as witness), the Court specifically stated that "the circumstances of this case do not involve an 'inquiry into the validity of the verdict' raised after the trial by

the Defendant." Id. at 846. The Court explained that "[t]here were no affidavits from jurors or attempts by the defendant to obtain any information from jurors after the trial." Id. The circumstances of this case are far removed from those of Blake.

Equally unpersuasive is Williams's assertion that an exception to the no-impeachment rule is applicable in this case because, in Peña-Rodriguez, the Supreme Court discussed cases that did not involve racial bias in which, according to Williams, the Court "never purported to limit exceptions [to] the no-impeachment rule to instances of racial bias." See Peña-Rodriguez, 137 S. Ct. at 863-66. In Peña-Rodriguez, id. at 866, the Supreme Court discussed Warger, 574 U.S. at 42-43, a civil case in which the Court rejected a plaintiff's contention that an exception to the no-impeachment rule was warranted because, during the jury's deliberations, a juror allegedly made statements indicating that the juror had a pro-defendant bias and, after the verdict in favor of the defendant, the plaintiff moved for a new trial, contending that the juror had lied during *voir dire* about her impartiality and ability to award damages. Nowhere in Peña-Rodriguez did the Supreme Court state or imply that it overruled any prior case, let alone announce a new standard to be applied in other cases involving the no-impeachment rule, regardless of whether the cases present similar circumstances.

For all of the reasons discussed above, the circuit court did not err in granting the motion to strike or abuse its discretion in denying the motion for a new trial.

### III. Sufficiency of the Evidence

Williams contends that the evidence is insufficient to support the convictions for second-degree murder and possession of a regulated firearm while under the age of twenty-

one.  Williams argues that we should not view the evidence in the light most favorable to the State because the not-guilty verdicts indicate that the State did not prove that Williams fatally shot Townsend.  Williams asserts that, even if we apply the usual standard of review, the evidence is insufficient because it merely gave rise to speculation about his guilt.

The State responds that Williams's request that we not view the evidence in the light most favorable to the State is unsupported by authority.  The State contends that, viewed in the light most favorable to it, strong circumstantial evidence established Williams's guilt beyond a reasonable doubt.

The standard of review of the sufficiency of the evidence is well established.  As we have consistently stated, "[i]n determining whether the evidence is legally sufficient, we examine the record solely to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Wilson, 471 Md. at 159, 240 A.3d at 1153 (citation omitted).  "In examining the record, we view the State's evidence, including all reasonable inferences to be drawn therefrom, in the light most favorable to the State." Id. at 159, 240 A.3d at 1153 (citation omitted).  In this case, we decline Williams's request that we depart from this longstanding standard of review.

Viewing the evidence in the light most favorable to the State, we conclude that the evidence is sufficient to support the challenged convictions.  In reaching the same conclusion, the Court of Special Appeals thoroughly discussed the reasonable inferences that the evidence gave rise to, stating:

> The evidence supports the inference that Townsend was shot in Williams' car: detectives recovered bullets and cartridge cases from the car, forensic analysts found bullet holes in the car's interior, and a witness saw Townsend

lying on the ground next to a car of matching description. The evidence supports the inference that Williams shot Townsend: Williams had been in the driver's seat to Townsend's left, Townsend's bullet wounds were from left to right, the trajectory of the bullet lodged in the rear door traced back to the area of the car's front left, and Williams could have had access to Townsend's handgun. The evidence furthermore supports the inference that Williams was the only person who could have shot Townsend: Williams was alone with Townsend when leaving Skinner's house, Williams was alone in the street with Townsend shortly after the shooting, and witnesses did not report anyone else present at or fleeing from the scene. Relatedly, in closing argument, the State invited the jury to infer that Williams stepped out of the car before shooting back in at Townsend. Based on the photographs of the trajectory rod analysis presented to the jury, the State argued that the bullet that lodged in the rear door passed directly through the area where the driver, Williams, would have been sitting. Therefore, the State argued, if an unidentified third person had shot Townsend—as Williams suggested at trial—Williams would also have been hit with gunfire. Because Williams was not hit, the argument goes, he must have been the shooter. The jury could also have accepted the State's argument that Williams sought to cover up his involvement in the shooting based on the evidence that Williams claimed to have parted ways with Townsend earlier and that Williams attempted to remove potential DNA evidence with bleach. To be sure, there is other evidence weighing against each of these inferences, but we will not second-guess the jury's determination where there are competing rational inferences available.

Williams, 251 Md. App. at 571-72, 254 A.3d at 584-85 (cleaned up). We adopt the Court of Special Appeals's sound logic. Although any one piece of evidence alone may not have been sufficient, all of the evidence combined—including the circumstances that blood, a bullet, and a cartridge case were found in Williams's vehicle, that he was the last person seen with Townsend, that Williams lied about dropping off Townsend on the night of his murder, and that Williams engaged in unusual behavior the next day, including cleaning his bathroom with bleach—was sufficient for a rational trier of fact to find Williams guilty beyond a reasonable doubt of second-degree murder and possession of a regulated firearm while under the age of twenty-one.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. PETITIONER TO PAY COSTS.**

Circuit Court for Charles County
Case No. C-08-CR-18-000005
Argued: February 7, 2022

IN THE COURT OF APPEALS

OF MARYLAND

No. 37

September Term, 2021

_____

NICHOLAS JABBAR WILLIAMS

v.

STATE OF MARYLAND

_____

Getty, C.J.,
*McDonald
Watts
Hotten
Booth
Biran
Wilner, Alan M.
(Senior Judge, Specially
Assigned),

JJ.

_____

Concurring Opinion by McDonald, J.,
which Booth, J., joins.

_____

Filed: March 25, 2022

*McDonald, J., now a Senior Judge, participated in the hearing and conference of this case while an active member of this Court. After being recalled pursuant to Md. Const., Art. IV, § 3A, he also participated in the decision and adoption of this opinion.

I concur in the judgment of the Court and write only to explain why I do so on the issue relating to allegedly inconsistent verdicts. I would forgo the exercise of classifying allegedly inconsistent verdicts into abstract categories such as "legally inconsistent", "factually inconsistent",[1] or another category with some similar label.[2] Rather, I would apply to that issue the analysis that the plurality opinion in *Stewart* set forth – that is, "whether the jury verdict on its face indicates that the jury failed to follow the trial court's proper instructions on the law governing the charged offenses." *State v. Stewart*, 464 Md. 296, 305 (2019). In *Stewart*, the three judges who joined the plurality opinion agreed that the jury verdict in that case did not demonstrate that the jury had failed to follow the court's instructions on the law governing the charged offenses; the four judges who applied the "legally inconsistent" versus "factually inconsistent" dichotomy stalemated 2-2 on which classification applied to the verdict in that case.

As Judge Harrell noted when he first proposed that the Court classify verdicts as "legally" or "factually" inconsistent, the reason for rejecting a "legally inconsistent" verdict lay in the fact that a jury returning such a verdict "acts contrary to a trial judge's

---

[1] The distinction between "factually inconsistent" and "legally inconsistent" verdicts is of recent origin and was derived by this Court from a law review article. *See McNeal v. State*, 426 Md. 455 (2012), *adopting rationale suggested in Price v. State*, 405 Md. 10, 35-38 (2008) (Harrell, J., concurring) (citing and relying on Ashlee Smith, Comment, *Vice-A-Verdict: Legally Inconsistent Jury Verdicts Should Not Stand in Maryland*, 35 U. Balt. L. Rev. 395 (2006)).

[2] As the Majority Opinion notes, Mr. Williams has described the verdicts in his case as "logically inconsistent." Majority slip op. at 13. Some courts have come up with yet other labels to differentiate allegedly inconsistent verdicts according to a variety of criteria. *See Stewart*, 464 Md. at 303 n.1 (plurality opinion).

proper instructions regarding the law." *Price v. State*, 405 Md. 10, 35 (2008) (Harrell, J. concurring); *see also McNeal v. State*, 426 Md. 455, 458 (2012). That is a very valid concern, but I would address it directly rather than via an abstract classification of a particular verdict.

In this case, as in *Stewart*,[3] there is no question that the trial court's instructions were generated by the evidence at trial and properly advised the jury on the elements of the charged offenses. In particular, the trial court instructed the jury that, in order for Mr. Williams to be convicted of second-degree murder, the State had to prove that (1) he had caused the death of the decedent and (2) he had done so with the intent either to kill or to inflict such serious bodily harm that death was the likely result. The trial court also instructed the jury that, in order for Mr. Williams to be convicted of first-degree assault, the State had to prove that he had intentionally or recklessly caused physical harm to the victim without legal justification and had used a firearm in doing so. The trial court's instruction on the use of a firearm in the commission of a felony[4] advised the jury that the predicate crimes charged in the case were first-degree murder and first-degree assault and that the State was required to prove that Mr. Williams had used a firearm while committing those felonies.

---

[3] *See Stewart*, 494 Md. at 307 (plurality opinion).

[4] As the Majority Opinion notes, the trial court gave an instruction on use of a firearm in the commission of a felony rather than a "crime of violence" – a distinction that did not matter given the predicate crimes charged in this case. Majority slip op. at 7 & n.5.

Given those instructions, the not-guilty verdicts on the assault and firearm offenses do not indicate that the jury failed to follow the court's instructions in returning a guilty verdict on the second-degree murder charge. Under the trial court's instructions, the former charges both required use of a firearm; the latter charge did not. Accordingly, the answer to the question whether the jury verdict on its face demonstrates that the jury failed to follow those instructions is "no."[5] I thus concur in the Court's rejection of Mr. Williams' claim that his conviction should be reversed on the basis of inconsistent verdicts.

Judge Booth has advised that she joins this opinion.

---

[5] Mr. Williams argues that the verdicts reveal that the jury failed to follow the court's instructions on the burden of proof, the presumption of innocence, and the jury's duty to decide the case on the evidence. However, that is not a claim that the verdicts are inconsistent, but rather a recasting of his argument that the evidence was insufficient to support his convictions on the second-degree murder and firearms possession charges – *i.e.*, that no reasonable jury could have found that the evidence satisfied those charges beyond a reasonable doubt. I agree with the conclusion of the Majority Opinion that the evidence at trial was sufficient to support the jury's guilty verdicts. Majority slip op. at 43-45.